NO. 12-12928-EE

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
                    *Plaintiff/appellee,*

v.

QUARTAVIOUS DAVIS,
                    *Defendant/appellant.*

———————————

On Appeal from the United States District Court
for the Southern District of Florida

———————————

BRIEF OF THE APPELLANT
QUARTAVIOUS DAVIS

———————————

JACQUELINE SHAPIRO, ESQ.
Counsel for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel.  (305) 403-8207
Fax: (305) 403-8209

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

---

# CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Quartavious Davis
### Case No. 12-12928

Appellant files this Certificate of Interested Persons and Corporate Disclosure

Statement, as required by 11th Cir. R. 26.1.

Altman, Roy, Assistant United States Attorney

Brown, Hon. Stephen T., United States Magistrate Judge

Caruso, Michael, Interim Federal Public Defender

Colan, Jonathan, Assistant United States Attorney

Davis, Quartavious, Defendant/Appellant

Dube, Hon. Robert L., Untied States Magistrate Judge

Ferrer, Wifredo A., United States Attorney

Fisher, Sylvester, Co-Defendant

Garber, Hon. Barry L., United States Magistrate Judge

Gold, Hon. Alan S., United States District Judge

Golembe, Stephen J., Co-Defendant Counsel

Korchin, Paul M., Assistant Federal Public Defender

Lenard, Hon. Joan A., United States District Judge

Malone, Omar, Co-Defendant Counsel

Martin, Michael, Co-Defendant

Martin, Jahmal A., Co-Defendant

McAliley, Hon. Chris M., United States Magistrate Judge

Michaels, Alexander J., Co-Defendant Counsel

Moss, Jr., Reginald A., Co-Defendant Counsel

O'Sullivan, Hon. John J., United States Magistrate Judge

Palermo, Hon. Peter R., Untied States Magistrate Judge

Perwin, Amanda, Assistant United States Attorney

Reid, Jamarquis T., Co-Defendant

Schultz, Anne R., Assistant United States Attorney

Shapiro, Jacqueline E., Appellate Counsel

Sibila, Jorge A., Co-Defendant Counsel

Smith, Willie, Co-Defendant

Torres, Hon. Edwin G., United States Magistrate Judge

Turnoff, Hon. William C., United States Magistrate Judge

Ungaro, Hon. Ursula, United States District Judge

White, Hon. Patrick A., United States Magistrate Judge

Williams, Hon. Kathleen M., United States District Judge

Zelman, Michael, Trial Counsel

## STATEMENT REGARDING ORAL ARGUMENT

The defendant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision making process. This appeal presents issues of constitutional magnitude. Those issues and others require intensive factual and legal analyses. The issues presented can best be considered with the aid of oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Course of Proceedings and Disposition in the District Court. . . . . . . . . . . 2

    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    The conspiracies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            1.    The first conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            2.    The second conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    The robberies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    The robberies encompassed by the first conspiracy. . . . 5

            2.    The robbery within the second conspiracy. . . . . . . . . 10

        C.    The conspirator witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.    Willie Smith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            2.    Michael Martin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        D.    Closing Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . . . . . 22

I.    DAVIS'S CONVICTION ON COUNT 17 (AIDING AND
       ABETTING THE USE OF A FIREARM IN CONNECTION
       WITH THE MAYORS ROBBERY) MUST BE VACATED,
       BECAUSE IT IS NOT SUPPORTED BY SUFFICIENT
       EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.   DAVIS'S FOURTH AMENDMENT RIGHTS WERE
       VIOLATED BY THE WARRANTLESS SEIZURE OF CELL
       TOWER SITE DATA, ENTITLING HIM TO A NEW TRIAL. . . . 28
       A.    Factual and procedural background. . . . . . . . . . . . . . . . . . . . . 28
       B.    Legal analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.  THE PROSECUTOR'S MISCONDUCT DURING CLOSING
       ARGUMENT RENDERED DAVIS'S TRIAL UNFAIR,
       ENTITLING HIM TO A NEW TRIAL. . . . . . . . . . . . . . . . . . . . 34

IV.   THE CUMULATIVE EFFECT AND PREJUDICE ARISING
       FROM MULTIPLE TRIAL ERRORS COMPELS REVERSAL

OF DAVIS'S CONVICTIONS AND A REMAND FOR A NEW

TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

V.    THE DISTRICT COURT VIOLATED DAVIS'S SIXTH

AMENDMENT JURY TRIAL RIGHT WHEN IT INCREASED

THE MANDATORY MINIMUM PENALTIES FOR EACH OF

HIS FIREARMS CONVICTIONS BASED ON JUDICIAL FACT

FINDING, ENTITLING HIM TO BE RESENTENCED. . . . . . . . 45

A.    The district court plainly erred when it increased the

minimum penalty for Count 3 based on its

finding that a firearm was brandished. . . . . . . . . . . . . . . . . . 46

B.    The district court erred when it increased the mandatory

minimum penalty for Counts 5, 7, 9, 11, 14 and 17 based

on its finding that they were "second or subsequent"

convictions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VI.   DAVIS'S CONSTITUTIONAL GUARANTEE AGAINST

CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED

WHEN HE RECEIVED A 162-YEAR SENTENCE OF

IMPRISONMENT FOR CRIMES COMMITTED DURING A

BRIEF PERIOD WHEN HE WAS A TEENAGER, SUFFERED

iv

FROM BIPOLAR DISORDER AND A SEVERE LEARNING

DISABILITY, AND HAD NO PRIOR CONVICTIONS. . . . . . . . 50

    A.    "The concept of proportionality is central to the Eighth

           Amendment." *Graham v. Florida*, 130 S. Ct. 2011, 2021

           (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    B.    Eighth Amendment proportionality analysis must take into

           account the "evolving standards of decency that mark the

           progress of a maturing society." *Graham v. Florida*, 130

           S. Ct. 2011, 2021 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    C.    "[I]ndividualized sentencing" is required "for defendants

           facing the most serious penalties." *Miller v. Alabama,* 132

           S. Ct. 2455, 2460 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        1.    The 162-year sentence imposed on Davis is

               extraordinary in its severity. . . . . . . . . . . . . . . . . . . . . . 56

        2.    Davis's personal characteristics render his sentence

               grossly disproportionate.. . . . . . . . . . . . . . . . . . . . . . . . . 59

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . 64

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

# TABLE OF CITATIONS

## CASES:

*Alleyne v. United States*, ___ S. Ct. ___, No. 11-9335,

    2013 WL 2922116 (June 17, 2013). . . . . . . . . . . . . . . . . . . . . . 20, 46, 47, 49

*Atkins v. Virginia*, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Bazemore v. United States*, 138 F.3d 947 (11th Cir. 1998). . . . . . . . . . . . . . . . 24

*Berger v. United States*, 295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Graham v. Florida*, 130 S. Ct. 2011 (2010). . . . . . . . . . . . . . . . . . . . . 51, 53, 56, 60

*Harmelin v. Michigan*, 501 U.S. 957 (1991). . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*Harris v. United States*, 536 U.S. 545 (2002). . . . . . . . . . . . . . . . . . . . . . 20, 46, 49

*Johnson v. United States*, 520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Katz v. United States*, 389 U.S. 347 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Miller v. Alabama*, 132 S. Ct. 2455 (2012). . . . . . . . . . . . . . . . . . 51, 53-56, 59-62

*Nye & Nissen v. United States*, 336 U.S. 613 (1949). . . . . . . . . . . . . . . . . . . . . 28

*Pinkerton v. United States*, 328 U.S. 640 (1946). . . . . . . . . . . . . . . . . . . . . . . . 28

*Roper v. Simmons*, 543 U.S. 551 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 60

*Smith v. Maryland*, 442 U. S. 735 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Solem v. Helm*, 463 U.S. 277 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Bancalari*, 110 F.3d 1425 (9th Cir. 1997) . . . . . . . . . . . . . . . . . 25

*United States v. Camargo-Vergara*, 57 F.3d 993 (11th Cir. 1995). . . . . . . . . . . . 28

*United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013). . . . . . . . . . . . . . . . . . 16

*United States v. Daniels*, 370 F.3d 689 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . 25

*United States v. Davis*, 313 F.3d 1300 (11th Cir. 2002).. . . . . . . . . . . . . . . . . . . 16

*United States v. Elkins*, 885 F.2d 775 (11th Cir.1989). . . . . . . . . . . . . . . . . . . . . 42

*United States v. Epps*, 613 F.3d 1093 (11th Cir. 2010). . . . . . . . . . . . . . . . . 16, 41

*United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . 37

*United States v. Friske*, 640 F.3d 1288 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . 22

*United States v. Garza*, 608 F.2d 659 (5th Cir. 1979). . . . . . . . . . . . . . . . . . 41, 42

*United States v. Haile*, 685 F.3d 1211 (11th Cir. 2012),

    *cert. denied*, 133 S. Ct. 1723 (2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Hamblin*, 911 F.2d 551 (11th Cir. 1990). . . . . . . . . . . . . . . . . . 24

*United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . 42

*United States v. Jones*, 132 S. Ct. 945 (2012).. . . . . . . . . . . . . . . . . . . . . . . . 30-32

*United States v. Labarbera*, 581 F.2d 107 (5th Cir. 1978). . . . . . . . . . . . . . . . . . 43

*United States v. Leach*, 918 F.2d 464 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . 40

*United States v. Lyons*, 53 F.3d 1198 (11th Cir. 1995).. . . . . . . . . . . . . . . . . . . . 27

*United States v. McLain*, 823 F.2d 1457 (11th Cir.1987).. . . . . . . . . . . . . . . . . . 43

*United States v. Medina*, 32 F.3d 40 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 25, 27

*United States v. Miller*, 425 U. S. 435 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Otero-Mendez*, 273 F.3d 46 (1st Cir. 2001). . . . . . . . . . . . . . . . 24

*United States v. Paz*, 405 F.3d 946 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Raffone*, 693 F.2d 1343 (11th Cir. 1982). . . . . . . . . . . . . . . . . . 28

*United States v. Robinson*, 389 F.3d 582 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . 25

*United States v. Russo*, 796 F.2d 1443 (11th Cir. 1986). . . . . . . . . . . . . . . . . . . 22

*United States v. Starrett*, 55 F.3d 1525 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . 22

*United States v. Tampas*, 493 F.3d 1291 (11th Cir. 2007). . . . . . . . . . . . . . . . . . 16

*United States v. Thompson*, 454 F.3d 459 (5th Cir. 2006). . . . . . . . . . . . . . . . . . 25

*United States v. Williams*, 334 F.3d 1228 (11th Cir. 2003). . . . . . . . . . . . . . . . . 24

*United States v. Woodruff*, 296 F.3d 1041 (11th Cir. 2002). . . . . . . . . . . . . . . . . 49

*United States v. Woods*, 148 F.3d 843 (7th Cir.1998). . . . . . . . . . . . . . . . . . . . . 27

*United States v. Young*, 470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**STATUTORY AND OTHER AUTHORITY:**

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16, 18, 19, 28-32, 34

U.S. Const. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17, 20, 45, 46

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 51, 52, 62

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 50

18 U.S.C. § 924(c). . . . . . . . . . . . . . . . . . . . . . . . . 18, 23-25, 27, 41, 45, 57, 58

18 U.S.C. § 924(c)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 50

18 U.S.C. § 924(c)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 45, 47, 48, 57

18 U.S.C. § 924(c)(1)(A)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

18 U.S.C. § 924(c)(1)(C)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 45, 49, 57

18 U.S.C. § 924(c)(1)(D)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

18 U.S.C. § 1951(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2703(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

18 U.S.C. § 3742(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with offenses against the laws of the United States.  The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction over all final decisions of the district courts of the United States, and 18 U.S.C. § 3742(a), which authorizes defendants to appeal their sentences.  The notice of appeal was timely filed on May 29, 2012, from the final judgment and commitment order entered on May 17, 2012, that disposes of all claims between the parties to this cause.

## STATEMENT OF THE ISSUES

1.      Whether Davis's conviction on Count 17 (aiding and abetting the use of a firearm in connection with the Mayors robbery) must be vacated, because it is not supported by sufficient evidence.

2.      Whether Davis's Fourth Amendment rights were violated by the warrantless seizure of cell tower site data, entitling him to a new trial.

3.      Whether the prosecutor's misconduct during closing argument rendered Davis's trial unfair, entitling him to a new trial.

4.      Whether the cumulative effect and prejudice arising from multiple trial errors compels reversal of Davis's convictions and a remand for a new trial.

5.      Whether the district court violated Davis's Sixth Amendment jury trial right when it increased the mandatory minimum penalties for each of his firearm convictions based on judicial fact finding, entitling him to be resentenced.

6.      Whether Davis's constitutional guarantee against cruel and unusual punishment was violated when he received a 162-year sentence of imprisonment for crimes committed during a brief period when he was a teenager, suffered from a learning disability and an emotional disorder, and had no prior convictions.

1

## STATEMENT OF THE CASE

### Course of Proceedings and Disposition in the District Court

Appellant Quartavious Davis was charged by superseding indictment with conspiring between August and October 2010 to commit a Hobbs Act robbery, in violation of  (Count 1).  D.E. 39:1-2.  Davis was charged with committing six Hobbs Act robberies within the same time frame, in violation of 18 U.S.C. § 1951(a) & 2 (Counts 2, 4, 6, 8, 10, 13); and using, carrying, and possessing a firearm in connection with those robberies, in violation of 18 U.S.C. § 924(c)(1)(A) & 2 (Counts 3, 5, 7, 9, 11, 14).  D.E. 39:2-9.  Additionally, Davis was charged with conspiring between September and October 2010 to commit a Hobbs Act Robbery (Count 15), committing a Hobbs Act robbery within that time frame (Count 16), and using, carrying, and possessing a firearm in connection with that robbery (Count 17).  D.E. 39:9-11.  Five co-defendants also were named in the indictment and charged in various counts, and each entered a guilty plea.  D.E. 39; PSI at 4.

Prior to trial, Davis moved to exclude evidence regarding cell tower site data that was obtained by law enforcement officers without a search warrant.  D.E. 272, 274.  At the conclusion of a hearing on the motion, the district court denied the motion.  D.E. 364:150-93.

2

Davis exercised his right to jury trial. During the trial, over Davis's repeated objections, the district court permitted the government to introduce cell site records covering the dates and times surrounding the charged robberies. D.E. 283:214, 218, 226-27, 231; D.E. 285:26-38. Davis also objected to improper prosecutorial comments during closing argument and moved unsuccessfully for a mistrial due to the improper comments. D.E. 287:20, 23, 26, 29-33, 68, 72, 108-14. At the end of the trial, Davis moved for a judgment of acquittal on all counts, and his motion was denied. D.E. 285:54, 70.

In a presentence investigation report prepared prior to Davis's sentencing hearing, a probation officer calculated Davis's sentencing guidelines range as 57-71 months for the Hobbs Act conspiracy and robbery convictions, plus 1,884 months in consecutive mandatory minimum sentences for the seven firearms convictions, for a total of 1,941-1,955 months. PSI ¶ 107. Davis objected to the sentence computed in the PSI as unconstitutional. PSI Addendum at 1; D.E. 322. The district court overruled the objections and sentenced Davis to a total of 1,941 months (almost 162 years') imprisonment. D.E. 342; D.E. 366:32-33, 38. The total sentence included a 57-month sentence on the robbery conspiracy and substantive counts, an 84-month (7-year) consecutive sentence on one firearm count, and six 300-month (25-year) sentences) on the remaining firearm counts. D.E. 342.

3

Davis filed a timely notice of appeal.  D.E. 344.  He currently is serving his *de facto* life sentence.

## Statement of Facts

### A.    The conspiracies.

#### 1.    *The first conspiracy.*

Quartavious Davis was charged with two separate conspiracies to commit robberies of businesses.  D.E. 39:1-2, 9-10.  The first conspiracy encompassed six robberies.  *See* D.E. 39:2-8.

Davis's co-defendant, Jahmal Martin, planned each of the robberies stemming from the first conspiracy.  He also provided the firearms used in the robberies, and he received a share of the robbery proceeds and doled out proceeds to others.  D.E. 283:100, 103, 107, 110, 115, 116, 121-22, 128-29, 137.  The government presented evidence that Davis and co-defendants Willie Smith and Jamarquis Reid committed five of the six robberies, and Smith, Davis and a man named Little Rod committed the sixth robbery.

Members of the first conspiracy knew one another socially, through family relationships, and/or through Jahmal Martin's place of business.  D.E. 283:85-88, 150.  Jahmal Martin ran a drug distribution site known as a drug hole.  D.E. 283:87.  Davis and Reid worked for Martin at the drug hole, and they hung out together while

4

using drugs.  D.E. 283:86-88, 150.  Smith and Reid are brothers, and Smith and Davis were friends.  D.E. 283:85, 150.

### 2.    *The second conspiracy.*

The second conspiracy  encompassed just one robbery, of a Mayors jewelry store, and it was committed after the other six robberies.  *See* D.E. 39:9-10.  An unindicted person named John Watson, a/k/a Rat Boy, planned the robbery.  D.E. 279:216, 225.  The second conspiracy originally had seven members, none of whom were involved in the earlier robberies.  D.E. 279:217.  The government presented evidence that Davis and Reid were recruited to join the conspiracy as replacements for two of the original members who dropped out at the last minute.  D.E. 279:227-28.

One of the conspirators, Michael Martin, bought drugs at Jahmal Martin's drug hole and was friends with Jahmal Martin, Reid, and Smith.  D.E. 279:204-07.  Michael Martin knew Davis, but they were not friends; the 30-year-old Martin was too old to be Davis's friend.  D.E. 279:201, 210; D.E. 281:30-31.

### B.    The robberies

### 1.    *The robberies encompassed by the first conspiracy.*

On August 7, 2010, Willie Smith went to a Little Ceasar's restaurant to commit a robbery.  D.E. 283:100.  Smith testified an unindicted individual drove Smith, Reid,

5

and Davis to the restaurant.  D.E. 283:103.  The robbers each carried a gun, and each

concealed his face with a t-shirt while robbing the restaurant.  D.E. 281:100-05; D.E.

283:100-01, 104-05.   After the robbery, the driver took the robbers to Jahmal

Martin's drug hole, where they returned the guns and divided the proceeds.  D.E.

283:107.  No victim identified Davis as a participant in the robbery.

Smith testified that on August 31, 2010, he, Reid and Davis traveled  by bus

and bicycle to the Amerika Gas Station for the purpose of robbing it.  D.E. 283:109-

10.  Before entering the gas station, the robbers concealed their faces with t-shirts.

D.E. 281:114-15; D.E. 283:111.  Each robber carried a gun.  D.E. 281:115-16; D.E.

283:111-12.  After the robbery, the robbers returned to the drug hole via bicycle and

bus; they returned the guns to Jahmal Martin and divided the proceeds.   D.E.

283:114-15.  No victim identified Davis as a participant in the robbery.

On September 7, 2010, Smith went to a Walgreens drug store to commit a

robbery.  D.E. 283:115-16.  Smith testified an unindicted individual drove Smith,

Reid, and Davis to the store. D.E. 283:116.  The robbers took t-shirts to conceal their

faces, and each carried a gun.  D.E. 283:116-17.  After the robbery, the driver took

the robbers back to the drug hole, where they returned the guns and split the proceeds.

D.E. 283:121.  No victim identified Davis as a participant in the robbery.

Smith testified that on September 15, 2010, Jahmal Martin drove Smith, Reid, and Davis to an Advance Auto store so they could rob it. D.E. 283:122, 128. The robbers concealed their faces with t-shirts and carried guns into the store. D.E. 281:148; D.E. 283:123. After the robbery, Jahmal Martin drove the robbers to the drug hole, where they returned the guns and split the robbery proceeds. D.E. 283:128.[1] No victim identified Davis as a participant in the robbery.

Smith testified that on September 25, 2010, Jahmal Martin drove Smith, Reid, and Davis to the Universal Beauty Salon to commit a robbery. D.E. 283:128. The robbers took t-shirts to conceal their faces, and each took a gun. D.E. 283:129-30. Smith testified that after leaving the car, Davis split off from Smith and Reid, and he remained outside struggling with someone while Smith and Reid entered the salon. D.E. 283:131. Next to the salon was a Tae Kwon Do school. D.E. 283:131. Edwin Negron testified he was smoking a cigarette outside the school when a gunman forced him into the school, ordered him to the floor, and knocked his wife and mother-in-law to the floor. D.E. 281:173-74. Several children were at the school for a tournament, and the owner of the school ushered the children to safety in another room. D.E.

---

[1]Smith testified that when they left the store, a dog barked, and Davis fired a gunshot. D.E. 283:127. There is no evidence the dog was hit.

7

281:174-75.  After taking a camera and cell phones from those present, the intruder left the school.  D.E. 281:174-75.

Meanwhile, Smith and Reid committed a robbery in the beauty salon.  D.E. 281:166-68; D.E. 283:131-32.  Smith testified Davis joined them in the salon and said "[l]et's go."  D.E. 283:133.  Jahmal Martin drove them away from the salon.  D.E. 283:133-34.

Negron, the man who was accosted at the Tae Kwon Do school, followed Jahmal Martin's car until he lost its trail at a toll plaza.  D.E. 281:177.  Negron wrote down the license plate number of the car and provided it to the police.  D.E. 281:177-78.  A police officer later heard a bulletin about the car, saw it, and stopped it.  D.E. 281:182-85.  The car was occupied by four women and perhaps a child.  D.E. 281:285.  The police officer impounded the car, and it was searched three days later.  D.E. 281:288-89.  A t-shirt was removed from the car, and DNA samples were extracted from the collar of the shirt.  D.E. 281:195; D.E. 283:29-35.  The fluid from which the DNA was extracted was not identified; it was not blood.  D.E. 283:67.  The DNA samples from the shirt matched a sample taken from Davis.  D.E. 283:59.  The shirt also bore someone else's DNA.  D.E. 283:62.  DNA analysts could not tell how Davis's DNA was transferred to the shirt, or how long it had been there.  D.E. 283:49,

8

65, 67. DNA can remain on fabric for "years and years and years." D.E. 283:46. No victim identified Davis as a participant in the events at the beauty salon or the school.

On September 26, 2010, Smith went to a Wendy's restaurant to rob it. D.E. 283:136-37. Smith testified Reid drove Smith, Davis, and a man named Little Rod to the restaurant. D.E. 283:137-38. Smith testified Reid stayed in the car, and Smith, Davis, and Little Rod entered the Wendy's. D.E. 283:138. The robbers concealed their faces with t-shirts and carried handguns into the restaurant. D.E. 283:72, 137-39. Little Rod robbed customers of their property while the other robbers removed money from cash registers. D.E. 283:139-40, 180; *see* D.E. 283:73-75. The robbers returned to the car, and Reid pulled away. D.E. 283:141.

As they drove away, a customer from the restaurant and a passenger in the car exchanged gun fire. D.E. 283:141-42, 182. Smith testified Davis fired a gun. D.E. 283:141-42, 183. The customer, however, testified the shooter was the same person who robbed the customers. D.E. 283:84. Additionally, the customer testified the shooter was seated in the back seat on the passenger side, D.E. 283:82-83, and Smith testified Little Rod was seated in that position, D.E. 283:141. Smith sustained a bullet wound to his buttocks. D.E. 283:142. No one else was injured. No victim identified Davis as a participant in the robbery or the exchange of gunfire.

9

Cell phone company records showed that Davis's cell phone was in the general vicinity of these six businesses at or near the times they were robbed.  D.E. 285:27-38.[2]

### 2.    *The robbery within the second conspiracy.*

Michael Martin testified that on October 1, 2010, a man named Rob drove Michael Martin, Sylvester Fisher, Reid, and Davis to a rendevous point where they met two other men.  D.E. 279:230-31.  Martin testified Rob passed a gun to Fisher when Fisher entered the car.  D.E. 279:231; D.E. 281:6.  Martin did not testify about any discussion concerning the gun.  D.E. 279:231; D.E. 281:6.

At the rendevous point, the other two men had a BMW SUV.  D.E. 279:231-32; D.E. 281:6-7.  Martin testified he gave Davis a hammer provided by Watson.  D.E. 279:233.  Martin testified Fisher then drove  Reid,  Martin and Davis to a Mayors jewelry store.  D.E. 281:8-9.

Upon arriving at the store, Fisher entered first.  D.E. 281:9.  He immediately pulled pepper spray from his pocket and sprayed a security guard.  D.E. 279:25.  Fisher then pulled a gun from his pocket and ordered everyone to the ground.  D.E.

---

[2]Davis moved to exclude these records, and he objected during trial to their admission.  D.E. 274; D.E. 283:214, 218, 226-27, 231; D.E. 285:26-38.  *See* Argument II, below.

279:30; D.E. 281:10.  Michael Martin testified Davis and Michael Martin followed Fisher into the store.  D.E. 281:9.  He testified he and Davis used sledge hammers to smash display cases containing expensive watches, and Fisher kicked over another display case.  D.E. 281:10-11; *see also* D.E. 279-27.  Michael Martin testified that he, Fisher, and Davis grabbed watches and fled the store.  D.E. 281:11.  Reid picked up the robbers in the BMW.  D.E. 281:12.  The group abandoned the BMW at a nearby park, where a driver was waiting with another vehicle.  D.E. 281:17.  The driver drove the group away from the area.  D.E. 281:17-18.  The stolen watches were turned over to John Watson.  D.E. 281:18-19.

A police officer later collected a small DNA sample from the back seat of the BMW.  D.E. 279:74-76, 99.  The sample consisted of three small spots that were so close together that the officer collected the evidence with a single swab.  D.E. 279:74, 76, 99.  The sample may or may not have been blood.  D.E. 279:91-92, 179.  A DNA analyst matched the sample to Davis's DNA.  D.E. 279:171.[3]  Michael Martin testified he was not aware of Davis cutting himself during the robbery or having any

---

[3]Defense counsel vigorously and extensively cross-examined the crime scene detective and the DNA analyst about the procedures used to collect and analyze the DNA sample, and whether the sample was blood or an unknown fluid.  D.E. 279:91-99, 172-89.

injuries while in the BMW.  D.E. 281:20, 81-85.  The BMW had been stolen sometime within the weeks preceding the robbery.  D.E. 279:194-95, 199.

## C.    The conspirator witnesses.

### 1.    *Willie Smith.*

Willie Smith was the only member of the first conspiracy who testified at trial. D.E. 283:83-203.[4]    Smith admitted at trial to committing all six robberies encompassed by the first conspiracy.  D.E. 283:100-40.  He faced a potential life sentence.  D.E. 283:89, 165.  Due to his cooperation in the investigation, he was permitted to plead guilty to just two robberies and two firearm charges, resulting in an original sentence of 32 years' imprisonment.  D.E. 283:89, 165, 176-77.  He hoped his testimony against Davis would lead to a reduction of his sentence.  D.E. 283:89.[5]

When first interviewed by police after his arrest, Smith did not mention Davis. D.E. 134-35, 146-47.  Smith told the police he committed the Universal Beauty Salon robbery with Jahmal Martin and a light-skinned guy, and he committed the Wendy's robbery with a person named Jay Rock.  D.E. 283:134-36, 146-47, 156-57.  He also

---

[4]Smith frequently used nicknames at trial to refer to other persons:  Jahmal Martin was called Pork Chop or Chop; Reid was called PooPoo; and Davis was called Quat.  D.E. 283:85-86.

[5]Indeed, it did.  After Smith testified against Davis, the government filed a motion to reduce Smith's sentence, and the district court reduced it to just over 19 years' imprisonment.  D.E. 326.

12

denied carrying a gun during the salon robbery. D.E. 283:136. Smith later identified

Davis as one of the robbers in hopes that he would receive a more lenient sentence.

D.E. 283:136, 148.

### 2.    *Michael Martin*

Michael Martin was the only member of the second conspiracy who testified

at trial. D.E. 279:201-34; D.E. 281:6-99.[6]  Michael Martin admitted at trial to

committing the Mayors robbery that was the object of the second conspiracy. D.E.

281:9-16. He originally received a 13 and one-half year sentence. PSI p. 4. He

hoped his testimony against Davis would lead to a reduction of his sentence. D.E.

279:215; D.E. 281:68-76.[7]

Michael Martin's criminal history included nine prior convictions for drug,

burglary, grand theft, and resisting crimes. D.E. 279:209-10; D.E. 281:47-51. When

he was arrested nearly two months after the Mayors robbery, he initially denied

committing the robbery. D.E. 279:211-12. Michael Martin decided he needed to

---

[6]Martin also frequently used nicknames at trial to refer to other persons:
Jahmal Martin was called Chop; Reid was called PooPoo; Davis was called Quat;
Fisher was called Sweet; and John Watson was called Rat Boy. D.E. 279:202-04,
216.

[7]Indeed, it did. After Martin testified against Davis, the government filed a
motion to reduce Martin's sentence, and the district court reduced it to just over 8
years' imprisonment. D.E. 325.

13

cooperate after the police told him they had DNA evidence. D.E. 281:38. When he admitted his involvement, he understated the amount of money he made from the robbery. D.E. 281:21. Also, when the detectives asked Michael Martin who else had gone into the Mayors store, Michael Martin named only himself and Fisher. D.E. 281:60-62. Michael Martin implicated Davis only after the police officers showed Martin Davis's photograph and stated Davis's full name. D.E. 281:54, 66-67. Prior to that time, Martin knew Davis only by his nickname, Quat. D.E. 281:54.

## D.    Closing Arguments

The prosecutor began his initial closing argument by stressing the importance of the evidence linking Davis's cell phone to specific cell towers. D.E. 287:4-5, 12-15,  20. He sprinkled references to this evidence throughout his closing argument. D.E. 287:4-5, 12-15,  20, 27, 62-64, 73, 75.

The prosecutor devoted much of the rest of his initial closing argument to shoring up the credibility of Willie Smith and Michael Martin, the two government witnesses who participated in the charged robberies. The prosecutor asserted that "Mr. Smith and Mr. Martin told the truth" about their own involvement and the involvement of Jamahl Martin (Pork Chop), Jamarquis Reid (PooPoo), and Sylvester Fisher (Sweet), and that their testimony about these men "was all true." D.E. 287:23. He further asserted that defense counsel wanted the jury to believe that Smith and

14

Martin testified truthfully "99.9 percent of the way," but lied only in their testimony about Davis.  D.E. 287:23-24.  Regarding Martin, the prosecutor stated, "[H]e came clean and confessed 100 percent and told the police precisely the same story that he told all of you, the same story he has told me 100 times since."  D.E. 287:26.

In his rebuttal closing argument, the prosecutor argued that cell tower site evidence did no place Davis at the site of the Mayors robbery because, prior to that time, he gave his cell phone to someone else.  D.E. 287:65-66.  Defense counsel objected that there was no evidence that Davis had given away his phone, but the district court overruled the objection.  D.E. 287:65.

Additionally, the prosecutor again emphasized the importance of the cell phone tower data and stated, "In the end, all Willie Smith and Michael Martin do is say things that are already corroborated in the evidence."  D.E. 287:66.

Finally, the prosecutor referred to Davis's defense as "this story that Mr. Zelman [defense counsel] has come up with."  D.E. 287:71.[8]

### Standards of Review

1.    This Court reviews *de novo* "the denial of a motion for acquittal and the sufficiency of the evidence to sustain a conviction, viewing the evidence in the light

---

[8]Additional facts pertinent to the issues on appeal are set out in the appropriate argument sections.

most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Tampas*, 493 F.3d 1291, 1297-98 (11th Cir. 2007) (internal quotation marks omitted). The Court must reverse a conviction where a reasonable juror could not have concluded the evidence established the defendant's guilt beyond a reasonable doubt. *Id*. at 1298.

2.    This Court reviews a district court's legal conclusions on Fourth Amendment claims *de novo*, and it reviews factual findings for clear error. *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002).

3.    This Court reviews prosecutorial misconduct claims *de novo,* because they present mixed questions of law and fact. *United States v. Epps*, 613 F.3d 1093, 1100 (11th Cir. 2010).

4.    In assessing whether relief is warranted based on cumulative error, the court considers whether "an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors)" has rendered the trial unfair. *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013) (internal quotation marks omitted). The effect of cumulative error "is determined by conducting the same inquiry as for individual error – courts look to see whether the defendant's substantial rights were affected." *Id*. (internal quotation marks omitted).

16

5.      Davis's assertion of a Sixth Amendment sentencing error presents a question of law.  Because Davis preserved his Sixth Amendment challenge to his enhanced sentences on Counts 5, 7, 9, 11, 14 and 17, the sentences on those counts are subject to *de novo* review. *United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005).  Davis's unpreserved challenge with respect to Count 3 is subject to review for plain error.  Fed. R. Crim. P. 52(b).

6.      Davis's assertion of Eighth Amendment sentencing error presents a question of law, subject to *de novo* review.  *United States v. Haile*, 685 F.3d 1211, 1222 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 1723 (2013).

## SUMMARY OF THE ARGUMENT

1.    Davis's conviction on Count 17 under 18 U.S.C. § 924(c) for aiding and abetting the use of a firearm in connection with the Mayors robbery must be vacated, because it is not supported by sufficient evidence.  With respect to Count 17, the government did not accuse Davis of personally carrying a firearm.  Instead, it asked the jury to convict Davis of aiding and abetting his co-defendant's possession of a firearm.  The government failed, however, to prove that Davis did anything to facilitate his co-defendant's possession of the firearm.  Participating in a robbery with the knowledge that an accomplice possessed a firearm would not suffice to support a § 924(c) conviction.  The government was required to show Davis performed an act that directly facilitated the gun possession.  Because the government failed to prove this fact, his conviction on Count 17 must be reversed, and the corresponding 25-year consecutive sentence must be vacated.

2.    Davis is entitled to a new trial, because the government violated his Fourth Amendment rights by obtaining cell tower site data without a warrant.  This data enabled the government to surmise Davis's whereabouts over a continuous two-month period by tracking where his cell phone had been used.

Long term location tracking by electronic means constitutes a Fourth Amendment search requiring a finding of probable cause and a warrant.  Davis did

18

not expect to be subjected to such an egregious, long-term intrusion on his privacy, and his expectation of privacy was reasonable.

The violation of Davis's Fourth Amendment rights resulted in severe, unfair prejudice at trial. The government relied heavily on the location evidence to support its theory that Davis was at the scene of six of the seven charged robberies. The other evidence of Davis's presence was scant and highly disputed. Absent the cell site evidence, it is unlikely the jury would have convicted Davis. Accordingly, Davis's convictions must be reversed.

3.     During his closing arguments, the prosecutor vouched for the credibility of two essential government witnesses – Davis's co-defendants, Willie Smith and Michael Martin, who were admitted robbers. The prosecutor expressed his faith in the witnesses' veracity, inaccurately claimed that even defense counsel found them credible, and assured the jury that Martin had repeated the same story to him 100 times. Aside from Smith and Martin's testimony, only scant, highly disputed evidence placed Davis at the scenes of the robberies. Given the paucity of identity evidence beyond Smith and Martin's testimony, this misconduct severely prejudiced Davis. Moreover, the prosecutor made additional improper remarks that exacerbated the harm caused by the repeated vouching.

The stakes in this case could not have been higher. Through its charging decisions, the government exposed Davis to a mandatory longer-than-life sentence. Under these circumstances, the government was obligated to meet the highest standards of ethical behavior in seeking his convictions. Instead, the prosecutor violated basic rules of conduct. For these reasons, Davis is entitled to have each of his convictions reversed.

4.     Davis is entitled to a new trial, due to the cumulation of the multiple prejudicial trial errors.

5.     The district court violated Davis's Sixth Amendment right to jury trial when it increased the mandatory minimum penalties for each of his firearms convictions based on judicial fact finding. The Supreme Court's recent opinion in *Alleyne v. United States*, ___ S. Ct. ___, No. 11-9335, 2013 WL 2922116, at *4 (June 17, 2013), holds that "any fact that increases the mandatory minimum [sentence] is an 'element' that must be submitted to the jury." The Court expressly overruled its earlier decision in *Harris v. United States*, 536 U.S. 545 (2002), which reached a contrary result concerning the interaction between the Sixth Amendment and mandatory minimum sentences. *Alleyne*, 2013 WL 2922116, at **4, 11.

*Alleyne* establishes that the district court erred when it imposed a brandishing enhancement to Davis's mandatory minimum sentence on Count 3, raising his

20

minimum sentence from 5 to 7 years. Additionally, the district court erred when it imposed a "second or subsequent" enhancement to the mandatory minimum sentence for each of Counts 5, 7, 9, 11, 14, and 17, raising his minimum consecutive sentences from 5 to 25 years. The district court imposed the enhanced minimum sentence for each of these seven counts, and it ordered all seven sentences to run consecutively, as required by statute. Consequently, Davis was sentenced to a total of 157 years' imprisonment for the firearms counts. In all, the district court's error resulted in an aggregate mandatory minimum sentence that was 122 years too long.

Davis was severely harmed by the district court's errors. The district court deemed a 40-year total sentence to be appropriate for Davis. The properly calculated 35-year aggregate mandatory minimum sentence for the firearm counts would have given the district court the discretion to impose the sentence it deemed appropriate. Davis's sentences on Counts 3, 5, 7, 9, 11, 14 and 17 must be vacated, and the case remanded, so the district court can exercise its discretion to impose a sentence in consideration of the five-year mandatory minimum sentence for each count.

6.    The district court violated Davis's Eighth Amendment guarantee against cruel and unusual punishment when it imposed a 162-year sentence for crimes committed over an eight-week period when he was just 18 and 19 years old, suffered from bipolar disorder and a severe learning disability, and had no prior convictions.

21

Davis is doomed to die in prison while serving this *de facto* life sentence without the possibility of parole. Davis's sentence is grossly disproportionate to both the offender and the offense.

## ARGUMENT AND CITATIONS OF AUTHORITY

I.  **DAVIS'S CONVICTION ON COUNT 17 (AIDING AND ABETTING THE USE OF A FIREARM IN CONNECTION WITH THE MAYORS ROBBERY) MUST BE VACATED, BECAUSE IT IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.**

The district court erred by denying Davis's motion for judgment of acquittal on Count 17 (D.E. 285:54, 70), because the evidence failed to establish he facilitated his co-defendant's use of a firearm during the Mayors jewelry store robbery.

When reviewing the sufficiency of the evidence to support a conviction, the Court considers the evidence in the light most favorable to the government and draws all reasonable inferences and credibility choices in the government's favor. *United States v. Friske*, 640 F.3d 1288, 1290-91 (11th Cir. 2011). Nevertheless, the government cannot be permitted to prevail on evidence that is anything less than "substantial" evidence of guilt. *See United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995) (holding that "'the question is whether there is substantial evidence to support the verdicts'") (quoting *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir. 1986)).

22

Davis was charged in Count 17 with violating 18 U.S.C. § 924(c) by using, carrying, or possessing a firearm in connection with the robbery of the Mayors jewelry store, or aiding and abetting that crime.  Davis's conviction on Count 17 was based exclusively on an aiding and abetting theory.  *See* D.E. 285:70 (prosecutor's response to motion for judgment of acquittal); D.E. 287:9-11 (prosecutor's closing argument).  The prosecutor acknowledged that Davis did not personally use, carry, or possess a firearm in connection with the Mayors robbery.  D.E. 285:70; D.E. 287:9. Instead, he argued simply that Davis participated in the Mayors robbery and that his co-defendant, Sylvester Fisher, brandished a gun during the robbery.  Specifically, in response to the motion for judgment of acquittal, the prosecutor stated that Davis was one of the robbers, and he argued that "during the robbery Mr. Sylvester Fisher brandished…a firearm."  D.E. 285:70.  Additionally, in his closing argument, the prosecutor told the jury, "Under the law of aiding and abetting, when two or more people engage in a criminal venture together, like a robbery of a jewelry store, each person is responsible for the criminal acts of each of the other persons in the store as if he or she had committed them himself."  D.E. 287:10.

Both the government's theory of culpability and the evidence the government offered to support the § 924(c) conviction were fundamentally flawed.  The evidence showed at most that Davis participated in a robbery and that another participant in the

23

robbery brandished a firearm. These facts do not suffice to prove that Davis aided and abetted the firearm crime. Instead, the government was required to show that Davis was connected to the firearm in some fashion that furthered his co-defendant's possession of the firearm.

This Court has held that in order to support a conviction for aiding and abetting a § 924(c) crime, the government must prove not only that someone committed the substantive firearm crime, but also "that the defendant associated himself with the criminal venture, and that he committed some act that furthered the crime." *United States v. Williams*, 334 F.3d 1228, 1232 (11th Cir. 2003); *see also Bazemore v. United States*, 138 F.3d 947, 949 (11th Cir. 1998) (requiring "some proof 'linking' the defendant to the gun"); *United States v. Hamblin*, 911 F.2d 551, 557 (11th Cir. 1990) ("the government must demonstrate … that the defendant associated himself with the criminal venture, and that he committed some act which furthered the crime."). Thus, where there was no evidence that Davis took any action to further his co-defendant's firearm possession during a jointly-committed robbery, his conviction for aiding and abetting the firearm crime must be vacated.

Several other appellate courts also require that a defendant intentionally take some action to facilitate the use of a firearm before he can be held accountable for aiding and abetting a § 924(c) crime. *See, e.g., United States v. Otero-Mendez*, 273

24

F.3d 46, 52 (1st Cir. 2001) ("[T]he prosecution must prove that appellant knew a firearm would be carried or used in a crime of violence and that he willingly took some action to facilitate that carriage or use."); *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994) (to support an aiding and abetting conviction under § 924(c), the government must prove the defendant "performed some act that directly facilitated or encouraged the use or carrying of a firearm"); *United States v. Thompson*, 454 F.3d 459, 465 (5th Cir. 2006) (the government "must prove that the defendant acted with the knowledge or specific intent of advancing the use of a firearm" and "performed some affirmative act relating to the firearm," *i.e.*, that "the defendant took some action to facilitate or encourage the use or carrying" of the gun) (internal quotation marks omitted); *United States v. Robinson*, 389 F.3d 582, 591 (6th Cir. 2004) (the "government must prove that the defendant both associated and participated in the use of the firearm in connection with the underlying crime") (internal quotation marks omitted); *United States v. Daniels*, 370 F.3d 689, 691 (7th Cir. 2004) ("The defendant must know, either before or during the crime, that the principal will possess or use a firearm, and then after acquiring knowledge intentionally facilitate the weapon's possession or use."); *United States v. Bancalari*, 110 F.3d 1425, 1430 (9th Cir. 1997) ("[T]he defendant must have directly facilitated or encouraged the use of the firearm and not simply be aware of its use.") (internal quotation marks omitted).

25

The evidence against Davis affirmatively showed he did not facilitate Sylvester Fisher's firearm possession.  First, Davis had no part in planning the Mayors robbery.  Instead, John Watson, a/k/a/ Rat Boy, planned the robbery.  D.E.  279:216, 225.  Michael Martin testified Davis was recruited as a last-minute substitute for another participant who dropped out of the scheme.  D.E. 279:227-28.  Second, Davis had no part in furnishing Fisher with the gun or in transporting the gun to the robbery scene.  Michael Martin testified that a man named Rob drove the robbers to the Mayors jewelry store, and Rob passed the gun to Fisher when Fisher entered the car.  D.E. 279:229-31; D.E. 281:6.  There was no evidence that anyone discussed the gun in Davis's presence, or that Davis even saw the gun before Fisher pulled it from his pocket after entering the store.  D.E. 279:30.  Third, there is no reason to infer that Davis had prior knowledge that a gun would be used in the robbery.  As reflected in the indictment and in trial testimony, the Mayors robbery was unrelated to the earlier robberies, so the use of guns in those robberies did not establish any knowledge or expectation of gun use during the Mayors robbery.  Moreover, Davis and Martin carried sledge hammers during the Mayors robbery, D.E. 279:226, 232-33, and Davis reasonably could have believed that wielding sledge hammers would be menacing enough to preclude any need for guns.

26

In any event, Davis's conviction on Count 17 cannot be based simply on his knowledge that his co-defendant possessed or brandished a firearm during a jointly-committed robbery. Knowledge, in the absence of any action that furthered the gun crime, cannot create criminal culpability, even under an aiding and abetting theory. *United States v. Lyons*, 53 F.3d 1198, 1202 (11th Cir. 1995). As the Court explained in *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994), a defendant "cannot be convicted as an aider and abettor under § 924(c) merely because he knew that a firearm would be used or carried and, with that knowledge, performed an act to facilitate or encourage the robbery itself. Rather, the language of the statute requires proof that he performed some act that directly facilitated or encouraged the use or carrying of a firearm." *See also United States v. Woods*, 148 F.3d 843, 848 (7th Cir.1998) ("Merely aiding the underlying crime and knowing that a gun would be used or carried cannot support a conviction under 18 U.S.C. § 924(c).").

Thus, even assuming Davis was a willful participant in the Mayors robbery, and assuming he knew Fisher possessed a firearm in connection with the robbery, he cannot be held liable for aiding and abetting Fisher's firearm crime, because he did

nothing to further that crime.  For these reasons, Davis's conviction on Count 17 must

be reversed, and the resulting 25-year consecutive sentence must be vacated.[9]

## II.    DAVIS'S FOURTH AMENDMENT RIGHTS WERE VIOLATED BY THE WARRANTLESS SEIZURE OF CELL TOWER SITE DATA, ENTITLING HIM TO A NEW TRIAL.

### A.    Factual and procedural background.

On or before February 2, 2011, the government submitted an unsworn

"Application for Stored Cell Site Information" to a magistrate judge.  D.E. 268-1.

The application did not request issuance of a warrant; instead, it requested an "order"

directing a cell phone provider to disclose "stored telephone subscriber records… and

corresponding geographic location data (cell site)" for  Davis's telephone number

(561-767-5642) for the period from August 1, 2010, through October 6, 2010.  D.E.

268-1:1.[10]  The application stated it was made pursuant to 18 U.S.C. § 2703(c) and

(d).  This statute does not expressly authorize the disclosure of cell site data.

---

[9]Davis's conviction on Count 17 cannot be sustained on a co-conspirator liability theory pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946), because the jury was not instructed on *Pinkerton* liability.  *See Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949) (a conviction can be affirmed on a *Pinkerton* theory of culpability only if that theory is presented to the jury); *accord United States v. Camargo-Vergara*, 57 F.3d 993, 1001 (11th Cir. 1995)*;United States v. Raffone*, 693 F.2d 1343, 1346 (11th Cir. 1982).

[10]The government also sought phone records pertaining to other defendants.

On February 2, 2011, a Magistrate Judge entered an order directing the requested production.  D.E. 266-1.  Davis's wireless service provider complied with the order.   The government obtained records and information from which it established the geographic location of Davis's cell phone at or near the times of six of the seven robberies charged in this case.  D.E. 285:27-38.

Prior to trial, Davis moved to suppress the cell tower site data relating to Davis's cell phone.  D.E. 272, 274.  After a hearing, D.E. 364:150-92, the district court denied Davis's motion without providing a legal basis for its ruling, D.E. 364:192-93.   During trial, over Davis's repeated objections, the district court permitted the government to introduce cell site records covering the dates and times surrounding the charged robberies.  D.E. 283:214, 218, 226-27, 231; D.E. 285:26-38. The records established that Davis's cell phone was in the general vicinity of six of the businesses at or near the time they were robbed.  D.E. 285:27-38.

## B.     Legal analysis.

Davis's Fourth Amendment rights were violated when the government, without a warrant, obtained cell site records that tracked Davis's movements over a two-month period.  The district court erred when it denied Davis's motion to exclude the cell site evidence at trial.

29

Just days before Davis's trial began, the Supreme Court issued its opinion in *United States v. Jones*, 132 S. Ct. 945 (2012). The *Jones* case addressed a Fourth Amendment challenge to the seizure of location evidence obtained over a 28-day period after a law enforcement officer attached a Global Positioning System (GPS) tracking device to an individual's automobile. *Id*. at 947. A five-member majority held the Fourth Amendment was violated; the Court applied a physical trespass rationale. *Id*. at 949-54. Two concurring opinions endorsed by a total of five justices embraced an alternative rationale for finding a Fourth Amendment violation: The defendant's reasonable expectation of privacy rendered the GPS tracking unconstitutional. *Id*. at 954-64.

In a concurring opinion joined by three other justices, Justice Alito declared: "I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." *Jones*, 132 S. Ct. at 958 (Alito, J., concurring). After noting the prevalence of "cell phones and other wireless devices" that "permit wireless carriers to track and record the location of users," Justice Alito concluded that "long term" or "lengthy monitoring" of an accused's location using a GPS device impinged upon a reasonable expectation of privacy and was an impermissible Fourth Amendment search. *Id*. at 963-64.

30

Justice Sotomayor also wrote a concurring opinion. She emphasized that "the reach of the Fourth Amendment does not 'turn on the presence or absence of a physical intrusion.'" *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring) (quoting *Katz v. United States*, 389 U.S. 347, 353 (1967)). After noting that "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable," *id.* at 954-55 (internal quotation marks omitted), Justice Sotomayor stated:

> I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on.

> * * * *

> More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. *E.g., Smith [v. Maryland*], 442 U. S. [735, 742 (1979)]; *United States v. Miller*, 425 U. S. 435, 443 (1976). This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.… I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

*Id.* at 956-57.

31

A numerical analysis of *Jones* reflects that at least five justices believe that long term location tracking by electronic means constitutes a Fourth Amendment search requiring a finding of probable cause and a warrant. We are unaware of any Eleventh Circuit case which holds to the contrary.

In this case, the government obtained, without a warrant, more than two months worth of historical data that it used to learn of Davis's movements. D.E. 266-1:2. Davis did not expect to be subjected to such an egregious, long-term intrusion on his privacy, and his expectation of privacy was reasonable. Indeed, the prosecutor told the jury that Davis "could not have known…his cell phone was tracking his every moment [sic]." D.E. 287:4-5. The seizure of Davis's extensive cell phone location data violated a privacy interest that the Constitution protects. The location evidence therefore should have been suppressed.

The violation of Davis's Fourth Amendment rights resulted in severe, unfair prejudice at trial. The government presented cell site evidence that linked Davis's cell phone to six robbery sites at or near the times of the robberies. D.E. 285:27-38. The prosecutor placed extraordinary emphasis on this evidence in its summation to the jury. The cell site evidence was one of the first things the prosecutor mentioned to the jury. D.E. 287:4-5. Thereafter, the prosecutor devoted more than three full, consecutive pages to explaining that the cell site evidence established Davis's

32

presence at or near the site of six robberies.  D.E. 287:12-15.  Additionally, the

prosecutor continually mentioned the cell site evidence throughout his closing

arguments.  *See, e.g.*, D.E. 287:4, 12, 13, 14, 15, 20, 23, 27, 62, 65, 66, 73, 75.

The cell site evidence was essential to the government's case.  With respect to

five of the six robberies for which the government introduced cell site evidence, the

only other evidence identifying Davis as being present at the robbery scenes was the

testimony of Willie Smith.  Smith had a powerful motivation to help the government

convict Davis by any means possible.  Smith admitted to participating in six armed

robberies.  If he had been prosecuted and convicted of all of his criminal conduct, he

would have faced mandatory minimum sentences for six firearms crimes, totaling 130

years, *see* 18 U.S.C. § 924(c)(1)(A)(i) and (C)(i), and additional sentences for

committing the robberies.  In return for his cooperation, Smith was allowed to plead

guilty to three robbery crimes and two firearms crimes, and he received an original

sentence of just 32 years.  PSI p. 4.  After testifying against Davis, Smith's sentence

was reduced to just over 19 years.  D.E. 326.  Aside from Smith's testimony, the only

additional evidence linking Davis to the sixth robbery scene was testimony that his

DNA (maybe sweat or spit) was found on a t-shirt seized from the getaway car.  That

car was driven by Jahmal Martin, Davis's boss in the drug business.  Given Davis's

33

close association with Martin, the jury could have found it inconsequential that a t-shirt linked to Davis was found in a car Martin drove.

Without the cell site evidence, it is highly unlikely that Davis would have been convicted of the charges arising from the six robberies associated with the cell phone location evidence, or of the three counts arising from the seventh robbery.

Because the cell phone location evidence was obtained in violation of Davis's Fourth Amendment rights, and because its admission severely prejudiced Davis, his convictions must be vacated.

## III. THE PROSECUTOR'S MISCONDUCT DURING CLOSING ARGUMENT RENDERED DAVIS'S TRIAL UNFAIR, ENTITLING HIM TO A NEW TRIAL.

Two of Davis's co-defendants, Willie Smith and Michael Martin, testified at trial.  These confessed robbers identified Davis as a participant in the charged offenses.  The testimony of the two robbers did not overlap, so they did not corroborate one another's testimony.  Smith testified about six of the robberies, and Martin testified about the seventh.  Their testimony was essential to the success of the government's case, because no other eye witness identified Davis as one of the robbers.  If the jurors had made an adverse credibility finding about either Smith or Martin, Davis would have been acquitted of some or all of the charges against him.

34

The credibility of the testimony elicited from Smith and Martin was highly questionable. Both had much to gain from helping the government secure Davis's convictions, and both gave multiple, conflicting stories to the police. *See* pages, 12-14, above.

The prosecutor was fully aware that Smith and Martin's testimony was vitally important, and their credibility was poor. In order to increase the chances of conviction, the prosecutor stepped beyond the bounds of proper closing argument and vouched for these witnesses' credibility. The district court erred when it denied Davis's motion for mistrial and excused the government's misconduct. D.E. 287:26, 29-33.

During his initial closing argument, the prosecutor proclaimed that once Martin learned there was evidence tying him to the Mayors jewelry store robbery, "he came clean and confessed 100 percent and told the police precisely the same story that he told all of you, the same story he has told me 100 times since." D.E. 287:26. With these remarks, the prosecutor expressed his personal belief in Martin's credibility ("he came clean and confessed 100 percent"), and he relied on facts not in evidence (that Martin had told him "the same story . . . 100 times"). *Id.*

The prosecutor also flatly asserted that "Mr. Smith and Mr. Martin told the truth" about their own involvement in the robberies and about the involvement of

35

Davis's other co-defendants, and assured the jury their testimony "was all true." D.E. 287:23. Even more outrageously, he argued that defense counsel credited the witnesses' testimony. The prosecutor stated: "[E]ven [defense counsel] will have to agree that the vast majority of what Smith and Martin said is true, that it is true, that they told the truth about all these other people despite the motive to lie," and "[defense counsel] is going to want you to believe that they told the truth 99.9 percent of the way." D.E. 287:23-24. These comments reflect both the prosecutor's personal belief in the credibility of Smith and Martin and his claim that defense counsel shared that belief.

The prosecutor's remarks contravene long-settled rulings of the Supreme Court and this Court condemning vouching for government witnesses. *See United States v. Young*, 470 U.S. 1, 18-19 (1985) (prosecutorial vouching "can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence"); *Berger v. United States*, 295 U.S. 78, 88 (1935) (recognizing that prosecutorial vouching is particularly insidious due to the danger that a jury will be

36

swayed to convict, based not upon actual evidence but upon the judgment of "the

government"); *United States v. Eyster*, 948 F.2d 1196, 1207 (11th Cir. 1991)

(prosecutorial vouching, both by manifesting personal belief in a witness's credibility

and by suggesting and insinuating the existence of facts not in evidence, is reversible

error).

Although the district court sustained objections to some of the prosecutor's

remarks and struck some of his remarks (D.E. 287:23, 26), these remedies were

inadequate to cure the damage caused by the prosecutor's blatant vouching.  With

respect to the comments about Martin's repeated confessions, the district court's

curative instruction was too vague to have any useful effect.  The prosecutor's

sentence that triggered the defense objection was lengthy and complex:

> Third, as with respect to Mr. Martin, as soon as Mr. Martin realized that
> his blood had been found in the BMW, as soon as he recognized that
> DNA doesn't lie, that DNA cannot lie, that Mr. Martin's blood, just like
> the defendant's blood, was all over those seats, he came clean and
> confessed 100 percent and told the police precisely the same story that
> he told all of you, the same story he has told me 100 times since.

D.E. 287:25-26.

In response to defense counsel's objection, the court stated, "I am going to

sustain and strike that comment.  Members of the jury, that's not in evidence, and

even if it was, that doesn't make the statement true or not true.  So that's not a proper

characterization of the evidence ….” D.E. 287:26. This instruction failed to specify which part(s) of the prosecutor's remarks the jury was to disregard. The jury easily could have applied the cautionary instruction in a manner that did not mitigate the harm caused by the prosecutor's wrongful vouching.

For example, the sentence that triggered the objection included the prosecutor's suggestion that Davis's blood “was all over [the car] seats,” D.E. 287:26, a claim the evidence did not support. Investigators found three closely-spaced droplets that might or might not have been blood, and the government offered highly disputed DNA evidence to link the droplets to Davis. *See* page 11, above. The jurors may well have believed the district court's cautionary instruction was aimed at the prosecutor's gross exaggeration about the vigorously disputed blood droplet evidence. Alternatively, jurors may have believed the district court was concerned exclusively about the prosecutor's claim that Martin had repeated his story “100 times,” leaving them free to consider the prosecutor's personal belief that Martin “came clean and confessed 100 percent.” D.E. 287:26. Given the vague nature of the cautionary instruction, it is highly questionable that the jurors understood they were required to disregard all of the vouching comments.

As to the prosecutor's claim that defense counsel would have to credit the vast majority of Smith and Martin's testimony, the district court struck one such remark,

but the prosecutor wasted no time in returning to the theme.  D.E. 287:23-24.  After the court's ruling, the prosecutor immediately vouched for the witnesses' truthfulness ("Mr. Smith and Mr. Martin told the truth . . . ."), and asserted that defense counsel would want the jury to believe the witnesses were truthful "99.9 percent of the way." D.E. 287:23-24.   Thus,  the  court's  striking  of  the  preceding  testimony  had  no practical effect.

Moreover, the prejudicial effect of the prosecutor's vouching for Martin and Smith's credibility was so great that a simple cautionary instruction could not cure the resulting harm.  As noted above, these witnesses' testimony was essential to Davis's convictions for all seven robberies.  As to the robbery of the Mayors jewelry store, just two witnesses identified Davis as a participant:  Martin, and the DNA analyst who testified about the vigorously disputed blood droplet evidence.

As to five of the other six robberies, the identification of Davis rested on two pieces of evidence:  the testimony of co-defendant Willie Smith, and constitutionally infirm evidence regarding the locations of Davis's cell phone.  *See* Argument II, above.  As to the remaining robbery (Universal Beauty Salon), the government relied on Smith's testimony, the unconstitutionally obtained cell phone location evidence, and DNA testimony linking Davis to a shirt found inside a getaway car driven by Jahmal Martin, Davis's boss in the drug business.  Given Davis's close association

39

with Martin, the jury could have found it inconsequential that a t-shirt linked to Davis was found in a car Martin drove.

Given this paucity of identification evidence, Davis likely would not have been convicted if the jury disbelieved the testimony of Martin and Smith. The prosecutor's expression of faith in these witnesses' veracity, his claim that even defense counsel found them credible, and his assurance that Martin consistently repeated his story on numerous occasions were central and powerful components of the government's closing argument.

The prosecutor also made additional improper remarks that exacerbated the harm caused by the repeated witness vouching. For example, the prosecutor pointed to Martin's conviction on Count 17 as proof that Davis also was guilty of Count 17. D.E. 287:11. Additionally, the prosecutor dismissed Davis's theory of defense as a "story [defense counsel] has come up with." D.E. 287:71. The prosecutor also explained away the absence of cell tower location evidence placing Davis in the vicinity of the Mayors jewelry store by arguing, with no testimonial support, that Davis had given away his cell phone before the robbery occurred. D.E. 287:65-66. Each of these arguments was improper, and each added to the severe prejudice caused by the prosecutor's forbidden vouching for the government's essential witnesses. *See United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990) ("Our precedents have

made it abundantly clear that evidence about the conviction of a coconspirator is not

admissible as substantive proof of the guilt of a defendant."); *United States v. Epps*,

613 F.3d 1093, 1100 (11th Cir. 2010) ("argument to the jury must be based solely on

the evidence admitted at trial") (quotation marks omitted).

The stakes in this case could not have been higher.  The government chose to

charge Davis with seven violations of 18 U.S.C. § 924(c), setting in motion a

prosecution that culminated in the district court's reluctant imposition of consecutive

mandatory minimum sentences totaling 157 years. D.E. 336:33, 38.[11]  After exposing

Davis to a mandatory longer-than-life sentence, the government was obligated to meet

the highest standards of ethical behavior in seeking his convictions.  While no trial

is perfect, surely the bar should be set at the highest attainable level when all of the

remaining years of a 19-year-old's life hang in the balance.  In *United States v. Garza*,

608 F.2d 659, 666 (5th Cir. 1979), this Court's predecessor noted the "double

burden" imposed upon the government's attorney "both to conduct his case zealously

and to assure that justice is done by complying fully and fairly with the rules of

conduct by which he is bound."  The Court reversed the defendant's conviction in

---

[11]These sentences were imposed consecutively to Davis's concurrent 57-month
sentences for the other counts of conviction.  D.E. 336:33, 38.

41

*Garza* upon finding "the prosecutor failed to observe these elementary principles of advocacy." *Id*. The same result is compelled here.

## IV. THE CUMULATIVE EFFECT AND PREJUDICE ARISING FROM MULTIPLE TRIAL ERRORS COMPELS REVERSAL OF DAVIS'S CONVICTIONS AND A REMAND FOR A NEW TRIAL.

This Court has held that a combination of trial errors and prosecutorial misconduct can deny a defendant a fair trial, regardless of whether the individual errors require reversal on their own. *United States v. Elkins*, 885 F.2d 775, 787 (11th Cir.1989); *see also United States v. Hands*, 184 F.3d 1322, 1329, 1335 (11th Cir. 1999) (reversing the defendant's convictions where multiple errors occurred).

In this case, Davis suffered prejudice from multiple trial errors, including the admission of unconstitutionally obtained cell phone location evidence (Argument II); and the prosecutor's numerous improper remarks in closing arguments (Argument III).

Where, as here, the prosecutor exposes the jury to prejudicial material and arguments repeatedly during the trial, the Court does not parse the improprieties and review them individually–under varying standards–but rather considers their effect on the defendant's substantial rights. The Court considers the prejudice cumulatively, to determine if the cumulative effect of the errors denied the defendant a fair trial. *See Hands*, 184 F.3d at 1334 ("[W]e assess not the prosecutorial misconduct alone,

42

but the combined impact of [all] errors on the verdict."); *United States v. McLain*, 823

F.2d 1457, 1462 (11th Cir.1987) (even if some errors would not in and of themselves

have warranted reversal, reversal is mandated where cumulative effect of errors

"denied the defendants a fair trial"); *United States v. Labarbera*, 581 F.2d 107, 110

(5th Cir. 1978) (same).

In assessing whether the combined effect of the errors rendered the trial

fundamentally unfair, a central concern is the nature of the government's competent

proof of its case. *See Davis v. Zant*, 36 F.3d 1538, 1551 (11th Cir. 1994) (reversing

convictions where "there was a substantial conflict in the relevant evidence"). The

competent proof linking Davis to the armed robberies was scant and unpersuasive.

The government offered the (1) incredible testimony of two co-defendants in

exchange for generous sentencing leniency; (2) DNA evidence of questionable

quality and low probity relating to two of the seven robberies; and (3) constitutionally

infirm cell phone location evidence relating to six of the seven robberies.

The government placed heavy emphasis on the DNA evidence, arguing, "DNA

cannot lie." D.E. 287:15. The value of the DNA evidence was minimal, however,

because DNA also cannot tell a coherent story. In this case, the DNA evidence did

not tell whether the substance found on the t-shirt found in the car driven by Jahmal

Martin after the Universal Beauty Salon robbery was sweat or spit or something else.

43

More importantly, DNA analysts testified they could not tell how or when Davis left his DNA on the shirt. D.E. 283:49, 65, 67. The DNA certainly did not tell who placed the shirt in the car. Davis worked for Jahmal Martin, selling drugs from Martin's drug hole. Davis may have worn the t-shirt and left it at the drug hole, and Martin or someone else may have placed the shirt in the car. Alternatively, Davis may have sat on the shirt in the car. A DNA analyst testified DNA can remain on fabric for "years and years and years." D.E. 283:46.

Likewise, the DNA analysis of the substance found in the stolen BMW used in the Mayors robbery did not establish whether the substance was blood or some other fluid. D.E. 279:91-92, 179. Neither did the DNA evidence explain how or when the substance was left in the vehicle. The BMW may have been stolen weeks before the Mayors robbery, D.E. 279:194-96, 199, and its whereabouts during that period was not accounted for. Additionally, the DNA evidence failed to explain how Davis could have sliced his finger inside the jewelry store without leaving blood on the shattered jewelry case, without co-defendant Michael Martin noticing the bloody injury, and without leaving more than three tiny drops of blood in the getaway car.

The factors addressed in the cited cases compel the conclusion that the cumulative error in this case severely harmed Davis. Because Davis suffered severe

44

prejudice from the numerous and pervasive trial errors, this Court must reverse his

convictions and remand for a new trial.

## V.    THE DISTRICT COURT VIOLATED DAVIS'S SIXTH AMENDMENT JURY TRIAL RIGHT WHEN IT INCREASED THE MANDATORY MINIMUM PENALTIES FOR EACH OF HIS FIREARMS CONVICTIONS BASED ON JUDICIAL FACT FINDING, ENTITLING HIM TO BE RESENTENCED.

The mandatory minimum penalty for using, carrying or possessing a firearm

in connection with a robbery is 5 years.  18 U.S.C. § 924(c)(1)(A)(i).  An enhanced

mandatory minimum penalty of 7 years applies "if the firearm is brandished."

§ 924(c)(1)(A)(ii).  An enhanced mandatory minimum penalty of 25 years applies if

the conviction is a "second or subsequent"  § 924(c) conviction.  § 924(c)(1)(C)(i).

The district court imposed a brandishing enhancement to Davis's mandatory

minimum sentence on Count 3, raising his minimum sentence from 5 to 7 years.  D.E.

366:21-23, 33, 38.  Additionally, the district court imposed a "second or subsequent"

enhancement to the mandatory minimum sentence for each of Counts 5, 7, 9, 11, 14,

and 17, raising his minimum consecutive sentences from 5 to 25 years.  D.E. 366:21-

23, 33, 38.  The district court imposed the enhanced minimum sentence for each of

these seven counts, and it ordered all seven sentences to run consecutively, as

required by statute.  D.E. 366:38; § 924(c)(1)(D)(ii).  Consequently, Davis was

sentenced to a total of 157 years' imprisonment for the firearms counts.  D.E. 366:38.

Each of Davis's seven firearms sentences violated his Sixth Amendment right to a jury trial, because the district court made factual findings that increased the applicable mandatory minimum sentences. *Alleyne v. United States*, ___ S. Ct. ___, No. 11-9335, 2013 WL 2922116 ( June 17, 2013).  In *Alleyne*, the Supreme Court held that "any fact that increases the mandatory minimum [sentence] is an 'element' that must be submitted to the jury."  2013 WL 2922116, at *4. The Court expressly overruled its earlier decision in *Harris v. United States*, 536 U.S. 545 (2002), which reached a contrary result concerning the interaction between the Sixth Amendment and mandatory minimum sentences.  *Alleyne*, 2013 WL 2922116, at **4, 11.

> **A.    The district court plainly erred when it increased the mandatory minimum penalty for Count 3 based on its finding that a firearm was brandished.**

Davis did not preserve an objection to the 2-year increase to the mandatory minimum sentence on Count 3 for brandishing a firearm.  He is entitled to relief, however, because the district court plainly erred by increasing the minimum sentence based on a fact not found by the jury.

Count 3 of the indictment did not charge Davis with brandishing a firearm, and the verdict form reflects no finding that Davis brandished a firearm.  D.E. 39:3; D.E. 293:1.  Davis's PSI identified the mandatory minimum sentence for Count 3 as 84 months (7 years).  PSI ¶ 106.  The 7-year minimum applies only if a firearm is

46

brandished. § 924(c)(1)(A)(ii). Otherwise, a 5-year sentence can be imposed. § 924(c)(1)(A)(i).

The district court stated it was imposing the mandatory minimum sentences for Davis's firearm convictions, and for Count 3, it imposed the shortest sentence permitted when a firearm is found to be brandished. D.E. 366:21-23, 33, 38. Thus, the district court relied on a fact not found by the jury (brandishing) to increase the mandatory minimum sentence on Count 3. This is the precise error addressed in *Alleyne,* 2013 WL 2922116 at *4.

*Alleyne* established that increasing a defendant's mandatory minimum sentence based on a judicial finding that he brandished a firearm is plainly erroneous. *Alleyne,* 2013 WL 2922116 at *4; *see also Johnson v. United States*, 520 U.S. 461, 468 (1997) ("where the law at the time of trial was settled and clearly contrary to the law at the time of appeal-it is enough that an error be 'plain' at the time of appellate consideration"). Additionally, the plain error obviously harmed Davis. The increase to the mandatory minimum sentence for brandishing the firearm resulted in the imposition of a 7-year sentence instead of a 5-year sentence. *See* D.E. 366:33 (the district court would have imposed a much lower sentence absent the statutory mandatory minimums).

47

Because the district court committed plain error that prejudiced Davis, the sentence on Count 3 must be vacated, and Davis must be resentenced. *Johnson*, 520 U.S. at 466-67.

**B.    The district court erred when it increased the mandatory minimum penalty for Counts 5, 7, 9, 11, 14 and 17 based on its finding that they were "second or subsequent" convictions.**

Davis preserved an objection to increasing the mandatory minimum sentences for Counts 5, 7, 9, 11, 14, and 17 from 5 years to 25 years.  D.E. 322:3-4 (noting, "none of the firearm counts were alleged or found by the jury to be second or subsequent"); D.E. 366:23-26.

The district court specified it was imposing 25-year mandatory minimum sentences for Counts 5, 7, 9, 11, 14, and 17.  D.E. 366:38.  The indictment did not allege the convictions on those counts were "second or subsequent" convictions, and the verdict form documented no such finding by the jury.  D.E. 39:3-11; D.E. 293. The fact of a second or subsequent conviction triggered the 25-year mandatory minimums; otherwise the minimum sentences permitted for Counts 5, 7, 9, 11, 14, and 17 would have been 5 years.  18 U.S.C. § 924(c)(1)(A)(i).

Because the 20-year increase in the mandatory minimum sentence from 5 to 25 years was not supported by a jury finding, the district court erred when it concluded

a 25-year sentence, rather than a 5-year sentence, was mandated for each of Counts 5, 7, 9, 11, 14, and 17.[12] *Alleyne*, 2013 WL 2922116, at *4**.**

In the absence of unconstitutional judicial fact finding, the aggregate mandatory minimum sentence Davis would have faced for Counts 5, 7, 9, 11, 14, and 17 was 30 years. The addition of a five-year consecutive sentence for Count 3 would have resulted in an aggregate minimum sentence of 35 years for his firearms offenses, rather than the minimum 157 years calculated by the district court for those seven counts. D.E. 366:38.

Although the district court believed itself legally bound to impose sentences totaling at least 157 years for the firearm counts, it stated its belief that a total sentence of 40 years' imprisonment would be appropriate for Davis. D.E. 366:33. The properly calculated 35-year aggregate mandatory minimum sentence for the firearm counts, in conjunction with the consecutive 57-month sentence imposed for

---

[12]*Alleyne* overrules this Court's opinion in *United States v. Woodruff*, 296 F.3d 1041, 1049-50 (11th Cir. 2002), in which the Court rejected a challenge to the application of a 25-year mandatory minimum sentence under § 924(c)(1)(C)(i) based on judicially found facts. *Woodruff*, like *Harris v. United States*, 536 U.S. 545, 557 (2002), reasoned that jury findings were necessary only when a fact increased a maximum sentence, and not when a minimum sentence was increased. *Woodruff*, 296 F.3d at 1050. When *Alleyne* expressly overruled *Harris*, it implicitly overruled *Woodruff*, which employed the same reasoning.

49

the robbery counts, would have given the district court the discretion to impose the sentence it deemed appropriate.

Davis was severely prejudiced by the 122-year error in calculating his mandatory minimum firearms sentences. Accordingly, his sentences on Counts 3, 5, 7, 9, 11, 14 and 17 must be vacated.

## VI.    DAVIS'S CONSTITUTIONAL GUARANTEE AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED WHEN HE RECEIVED A 162-YEAR SENTENCE OF IMPRISONMENT FOR CRIMES COMMITTED DURING A BRIEF PERIOD WHEN HE WAS A TEENAGER, SUFFERED FROM BIPOLAR DISORDER AND A SEVERE LEARNING DISABILITY, AND HAD NO PRIOR CONVICTIONS.

The district court reluctantly sentenced Quartavious Davis to a 1,941-month term of imprisonment – nearly 162-years. D.E. 366:33, 37-38. This draconian sentence included consecutive, mandatory minimum sentences totaling 1,884 months (157 years) for Davis's seven violations of 18 U.S.C. § 924(c)(1)(A) & 2. D.E. 342:3. If the district court's discretion had not been eliminated by the mandatory statutory sentencing scheme, it would not have imposed this *de facto* life sentence. D.E. 366:33. Instead, it would have imposed a 40-year sentence. D.E. 366:33.

Like all defendants currently sentenced under federal law, Davis will never have an opportunity for parole. Thus, he is doomed to die in prison. Davis's *de facto*

mandatory, life-without-parole sentence violates the Eighth Amendment prohibition against "cruel and unusual punishments."  U.S. Const. Amend. VIII.

A.    **"The concept of proportionality is central to the Eighth Amendment."** *Graham v. Florida*, **130 S. Ct. 2011, 2021 (2010).**

The Eighth Amendment requires proportionate sentencing. *Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010); *see also Solem v. Helm*, 463 U.S. 277, 290 (1983). Thus, the Eighth Amendment embodies the principle that "punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller v. Alabama*, 132 S. Ct. 2455, 2463 (2012) (internal quotation marks omitted).  "[N]o penalty is *per se* constitutional."  *Helm*, 463 U.S. at 290.

B.    **Eighth Amendment proportionality analysis must take into account the "evolving standards of decency that mark the progress of a maturing society."** *Graham v. Florida*, **130 S. Ct. 2011, 2021 (2010).**[13]

The law governing Eighth Amendment proportionality analysis is dynamic. "To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." *Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010) (internal quotation marks omitted).  The Supreme Court's recent opinions therefore provide an appropriate starting place for analyzing whether a sentence is unconstitutionally

---

[13]Internal quotation marks are omitted.

harsh.  Recent Supreme Court opinions establish that Davis's *de facto* life sentence is grossly disproportionate.

In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court reviewed a death sentence imposed on a defendant who committed a brutal first degree murder at the age of 17.  *Id*. at 556-57.  The Court held the Eighth Amendment prohibits imposing death sentences on those who commit crimes while under the age of 18.  *Id*. at 578.  The Court recognized that developmental differences between juveniles and adults diminish the blameworthiness of juvenile offenders.  *Id*. at 569-71. Additionally, while the Court fixed the boundary between juvenile status and adulthood at age 18 for the purpose of categorically prohibiting the execution of juvenile offenders, it recognized that the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id*. at 574.

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held the Eighth Amendment prohibits imposing death sentences on persons whose intellectual functioning is in a low range.  The Court concluded, "Because of their disabilities in areas of reasoning, judgment, and control of their impulses, [intellectually disabled persons] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."  *Id*. at 306.  *Atkins* established that personal characteristics beyond age also can render a sentence unconstitutional.

52

In *Graham v. Florida*, 130 S. Ct. 2011, 2034 (2010), the Supreme Court held the Eighth Amendment prohibits imposing life sentences without the possibility of parole on juveniles convicted of non-homicide crimes. In *Graham*, the trial court originally sentenced a defendant to a term of probation for an armed burglary and another crime he committed at the age of 16. *Id*. at 2018. Shortly before he turned 18, the defendant and others committed an armed home invasion robbery, as well as an attempted robbery during which an accomplice was shot. *Id*. at 2018-19. Based on these events, the trial court revoked his probation for the earlier armed burglary and imposed a life-without-parole sentence. *Id*. at 2020. The Supreme Court concluded the sentence was unconstitutional due to the limited culpability of juvenile non-homicide offenders, the inadequacy of any penological theory to justify life-without-parole sentences for juvenile non-homicide offenders, and the severity of life-without-parole sentences. *Id*. at 2029-30.

Finally, in *Miller v. Alabama*, 132 S. Ct. 2455, 2460 (2012), the Supreme Court addressed the harsh effect of mandatory sentences and held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eight Amendment's prohibition on 'cruel and unusual punishments.'" The offenders in *Miller* committed murders when they were teenagers. *Id*. at 2461-62.

53

The Supreme Court stressed that a mandatory sentencing scheme prohibits a sentencing judge from "assessing whether the law's harshest term of imprisonment proportionately punishes" an offender. *Miller*, 132 S. Ct. at 2466. Additionally, the Court stated, "[I]ndividualized sentencing" is required "for defendants facing the most serious penalties." *Id*. at 2460. Just as the Supreme Court in *Miller* held that the Constitution bars taking away all discretion from judges in sentencing juveniles to life imprisonment for committing murder, so also is it cruel and extreme to allow unfettered prosecutorial discretion to force a sentencing judge to impose a life sentence on a teenage first offender convicted of lesser charges, as in the circumstances of this case. The Court in *Miller* did not disturb sentencing courts' discretion to impose life sentences without parole in homicide cases when they deemed such harsh sentences to be appropriate. Thus, *Miller* establishes that an otherwise permissible sentence may be rendered unconstitutional when its imposition is mandatory rather than discretionary. The adoption of this principle marks an evolutionary shift from the Court's prior decision in *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991), in which the Court held that a non-capital sentence that is not otherwise cruel and unusual does not become so when its imposition is mandatory.[14]

---

[14]In *Harmelin*, 501 U.S. at 961, 965, the Supreme Court rejected an Eighth Amendment challenge to a mandatory life-without-parole sentence for possession of

(continued...)

This line of cases establishes the vital need when conducting proportionality review to consider a defendant's age and level of maturity, his mental and emotional condition, and whether the sentence imposed was the product of mandatory or discretionary sentencing.  All three factors compel the conclusion that the *de facto* life-without-parole sentence imposed on Davis was grossly disproportionate to his circumstances and to the crimes committed.

---

[14](...continued)

more than 650 grams of cocaine.  A majority of the Court deemed the mandatory nature of the sentence irrelevant to its Eighth Amendment analysis.  *Id*. at 994-95.  The Court's analysis in *Harmelin* is distinguishable from *Miller* and from this case, because the *Harmelin* Court considered the challenge to the mandatory nature of the sentence independently of its proportionality analysis.  *Id*.  In *Miller* and in this case, the mandatory nature of the sentence is integral to the proportionality analysis.

*Harmelin* did not provide a majority opinion addressing proportionality review.  In the controlling plurality decision, Justice Kennedy conducted his proportionality review by comparing the crime committed to the sentence imposed, and he concluded the sentence was grossly disproportionate to the crime.  *Harmelin*, 501 U.S. at 996-1005 (Kennedy, J., concurring in part and concurring in judgment).  The *Harmelin* analysis did not address any relevant characteristics of the offender.  Thus, Justice Kennedy did not address the principles governing this case – the need for individualized sentencing when relevant characteristics are present.

55

**C.**    **"[I]ndividualized sentencing" is required "for defendants facing the most serious penalties."** *Miller v. Alabama,* **132 S. Ct. 2455, 2460 (2012).**

**1.**    ***The 162-year sentence imposed on Davis is extraordinary in its severity.***

The 162-year sentence imposed on Davis is functionally equivalent to a life sentence without the possibility of parole. A life-without-parole sentence is the harshest penalty that can be imposed on an offender who is convicted of a non-homicide offense. By any measure, it fits within the category of "the most serious penalties" that possibly can be imposed. *United States v. Miller,* 132 S. Ct. 2455, 2460 (2012). Moreover, a life-without-parole sentence imposed on a teenager is far more onerous than a life-without-parole sentence imposed on a person of middle or advanced age, due to its greater duration. *Graham*, 130 S. Ct. at 2028.

Additionally, a life-without-parole sentence is unique in its perpetual nature. "It deprives the convict of the most basic liberties without giving hope of restoration…." *Graham*, 130 S. Ct. at 2027. The Supreme Court has noted that life-without-parole sentences "share some characteristics with death sentences that are shared by no other sentences." *Id.* "Imprisoning an offender until he dies alters the remainder of his life by a forfeiture that is irrevocable." *Miller*, 132 S. Ct. at 2466 (internal quotation marks omitted).

56

The harshness of the life-without-parole sentence imposed on Davis is particularly striking when compared to sentences imposed in federal courts for murder during fiscal year 2012. Nationally, the mean sentence length for murder was 252 months, while the median sentence length was 216 months. www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/State_District_ Circuit/2012/11c12.pdf. In the Eleventh Circuit, the mean sentence length for murder was 200 months, while the median sentence length was 120 months. *Id*. These sentences pale in comparison to Davis's 1,941-month sentence, imposed in a case in which no robbery victim was physically injured during the course of the crimes.

Davis's extraordinary sentence was achieved through a practice called stacking. The government exercised its prosecutorial discretion to charge Davis with seven violations of 18 U.S.C. § 924(c). This charging decision ensured that if Davis was convicted of all counts, he would receive consecutive sentences totaling no less than 155 years' imprisonment (one mandatory minimum 5-year sentence plus six mandatory minimum 25-year sentences). § 924(c)(1)(A)(i), (C)(i). The government utilized its charging discretion to ensure that Davis would be sentenced as a persistent recidivist, despite his lack of a prior felony conviction. *See* PSI ¶¶ 79, 80. The government's charging decision ran afoul of the Department of Justice's own guidelines: Since 2003 the Department of Justice has discouraged prosecutors from

57

stacking charges in cases where the practice can lead to excessive sentences.[15] A 162-year sentence – the length of two lifetimes – certainly fits within that category. The government's decision to stack Davis's seven § 924(c) offenses makes his sentence unusually serious.

The harshness of the 162-year sentence also is illustrated by the sentences imposed on Davis's co-defendants. The co-defendants are serving sentences ranging from eight to 22 years. *See* D.E. 206, 311, 325, 326, 334. These results were possible only because the government exercised restraint in not pursuing stacked charges against any of Davis's co-defendants. The sentences imposed on Davis's co-defendants, which were crafted through the government's selection of the charges it pursued, demonstrate that the extraordinary 162-year sentence imposed on Davis was grossly disproportionate to the crimes committed. The government and the district court deemed Davis less culpable than one of his co-defendants and equally culpable to the others. PSI ¶¶ 17, 18; D.E. 364:164.

---

[15]Undersigned counsel is not privy to the government's policy document. The anti-stacking policy is reported in an article appearing at: www.huffingtonpost.com/2012/07/03/quartavious-davis-florida-man-injustice-sentence_n_1645120.html.

### 2. *Davis's personal characteristics render his sentence grossly disproportionate.*

Given the extreme nature of the sentence Davis faced, he was entitled to be sentenced individually. Instead, the district court was forced to sentence him to a *de facto* life sentence without parole, the harshest sentence that can be imposed on a non-homicide offender, including those with the worst possible criminal histories who have committed the most heinous crimes.

Davis's age presents a compelling circumstance in analyzing the validity of his sentence. Davis was still a teenager during the 8-week period over which the charged crimes were committed. Davis turned 19 during that period. PSI p. 5; PSI ¶¶ 3, 4, 6, 7, 9, 12, 14. The Supreme Court has recognized that "[a]n offender's age…is relevant to the Eighth Amendment, and so criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Miller,* 132 S. Ct. at 2466 (internal quotation marks omitted).

The Supreme Court has identified "three significant gaps between juveniles and adults." *Miller,* 132 S. Ct. at 2464.

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable...to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings.

59

And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Id*. at 2464 (quotation marks, brackets, and citations omitted).

The Supreme Court also explained that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id*. at 2465.

Because Davis was 18 and 19 years old at the time of the charged crimes, he cannot avail himself of the protections afforded categorically by the Supreme Court to juveniles. Nevertheless, Davis's youth is an essential factor that must be considered, in conjunction with other related factors, in assessing his culpability and the penological justifications for keeping him forever imprisoned. Teenagers mature at different rates. The Supreme Court recognized in *Roper v. Simmons*, 543 U.S. 551, 574 (2005), that turning 18 does not guarantee intellectual maturity. The Court stated, "[Q]ualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id*. Additionally, the Supreme Court noted in *Graham*, 130 S. Ct. at 2026, that "parts of the brain involved in behavior control continue to mature through late adolescence." As explained below, Davis has a history of intellectual and emotional deficits. Thus, it would be unrealistic to assume that Davis had the

60

benefit of full intellectual maturity at the time of the charged offenses, despite having crossed into chronological adulthood.

"Just as the chronological age of a [youthful defendant] is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in assessing his culpability." *Miller,* 132 S. Ct. at 2467 (internal quotation marks omitted).  After being indicted, Davis was evaluated by a psychologist.  Defense counsel submitted a report prepared by the psychologist to the district court for consideration at sentencing.  D.E. 335-1.

The report reveals that Davis has been under psychiatric care and has been prescribed psychotropic medication since early childhood.  D.E. 335-1:1, 4, 5, 7-8. He was unable to name the prescribed medications or his most recent diagnosis; he encouraged the psychologist to get that information from his loving and supportive mother.  D.E. 335-1:1, 4.  Davis's mother reported he had been diagnosed with Bipolar Disorder and placed on Vyvanse (which assists with attention), Trazedone (an anti-depressant), and Oxcarbazepine (an anti-convulsant that sometimes is prescribed to stabilize mood).  D.E. 335-1:5.

Additionally, Davis struggled in school, and he was placed in "Emotionally Handicapped" and "Learning Disabled" classes, beginning in elementary school and continuing until he dropped out in the eleventh grade.  D.E. 335-1:3, 5, 7.  He

61

experienced trouble with reading and writing. D.E. 335-1:7. Davis suffers a severe verbal learning disability. D.E. 335-1:6, 7, 8.[16]

These factors establish that Davis's chronological age did not accurately reflect his level of intellectual maturity. This factor is essential in assessing whether the extraordinarily severe punishment meted out to Davis is "graduated and proportioned to both the offender and the offense." *Miller*, 132 S. Ct. 2455, 2463 (2012) (internal quotation marks omitted).

Davis's *de facto* life-without-parole sentence is grossly disproportionate to both the offender and the offense. The 162-year sentence guarantees Davis will die in prison, despite the lessened culpability associated with his youthfulness, his emotional and intellectual disorders, and his first-time offender status; despite the fact that the district court wished to impose a much shorter sentence; and despite the fact that the government deemed much more lenient sentences sufficient for his equally or more culpable co-defendants.

Because Davis's sentence violates the Eighth Amendment, his sentence must be vacated.

---

[16]Davis's mental and emotional health and his educational background also are addressed in the PSI at ¶¶ 94 and 99.

62

## CONCLUSION

Based upon the foregoing argument and citations of authority, the Court should

vacate Davis's convictions.  Alternatively, the Court should remand for resentencing.

Respectfully submitted,


*s/Jacqueline E. Shapiro*

JACQUELINE E. SHAPIRO, ESQ.
Attorney for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel.  (305) 403-8207
Fax: (305) 403-8209

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contain 13,933 words.

*s/Jacqueline E. Shapiro*
Jacqueline Shapiro

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Brief was mailed by U.S. mail to Kathleen M. Salyer, 99 N.E. 4th Street, Miami, Florida 33132-2111.

*s/Jacqueline E. Shapiro*
Jacqueline E. Shapiro